Chancellor Waties
delivered the opinion of the court:
A Bill was brought by the complainants in the Circuit Gouty of Georgetown, to set aside a conveyance ii^ *76 fee of a tract of land made to the defendant by their late father Thomas Wilson; which land, they allege was devised to him for life onfy, and to them in remainder, by the will of their great grand-father William Wilson. They allege also in their bill that they are minors, that the title deeds of the lands are in the hands of the defendant, that he had obtained the said conveyance from their father by fraudulent means, and that being, doubtful of its validity, he had taken various securities from him as an indemnification. The bill, therefore, prays that the defendant may be compelled to deliver up to the complainants the possession of the land, with the title deed belonging thereto, and also to account to them for the rents and profits thereof from the death of their father when their title accrued.
The defendant both answered and demurred. In his answer he admits the will of William Wilson, and that Thomas Wilson held the land under the said will; he admits also that he purchased the same from him by giving another tract of land in exchange, and took the alleged indemnification; but he denies the fraud charged in the bill. The demurrer is to the jurisdiction of the court, on the general ground that the complainants “ had not made out such a case as would entitle them to any discovery or relief in Equity, and that they had a fulband ample remedy at law.” The Circuit Court entertained the bill, and decreed that the defendant should deliver up to the complainants the land and title deeds, and account to them for the said mesne profits.
From this decree the defendant has appealed, and insists on a number of objections; but the three following comprise all that require any discussion from the court:
1st. That the Circuit Court proceeded to decree upon the face of the bill, without hearing argument except on the demurrer, and without testimony on either side.”
2d. “ That the Circuit Court assumed a jurisdiction not wárrantéd by 'the latvs 'Of the land ill taking 'cognizance of *77 the case, because the complainants had a plain and adequate remedy at law.”
3d. “ That the Circuit Court assumed a jurisdiction not warranted by the previous usage of the same, in trying the validity of a title to a freehold between adverse claimants.”
1st. It is sufficient answer to the first objection, to state that the right now contested had been before adjudicated. In the case of Grant and others vs. Thompson and others, the creditors of Thomas Wilson brought their bill against the defendants, who represented the interests of the present complainants, to make the estate of William Wilson liable for the debts of Thomas^ Wilson, on the ground that he took an absolute estate under his grandfather’s will. The Circuit Court decided the contrary, and on an appeal to this court, it was the unanimous opinion of the Judges that, according to the true intention of the testator, which was sufficiently manifested by the words of the will, Thomas Wilson took only an estate for life, and his issue, the present complainants, took a remainder in fee, as purchasers.
At the hearing therefore of the present case, the defendant having admitted by his answer, as well as by. the demurrer, that he held the land under Thomas Wilson, whose right was derived from the will of William Wilson, and the Court of Appeals having declared such right to he only for life, and the remainder to be now vested in the complainants, it w:ould have been improper to have allowed the same right to be again controverted on the same ground.
It was res judicata, and the decree of tire Court of Appeals ought to be regarded in that and every other court as a conclusive title for the complainants, to every part of the estate of William Wilson, depending on the construction of his will. Two cases decided by the Constitutional Court are strong authorities for this. Woodward *78 vs. Starke, 1 Nott & McCord, p. 329 ; and Scott vs. Cohen, 2 Nott & McCord, p. 298.*
It. was unnecessary for the same reason, to inquire into the charge of fraud, for the proof of such a charge would, not have strengthened the right of the complainants, nor would the disproof 6f it by the defendant have benefitted his claim. The counsel, therefore, on both sides, were properly confined to the questions founded on the demurrer, and the face of the proceedings.
2d. The second objection is, “ that, the Circuit Court assumed a jurisdiction, not warranted by the laws of the' land, in taking cognizance of the case, because the complainants had a plain and adequate remedy at law.”
Every objection of this kind is entitled to the most serious consideration. It is of great importance that the boundaries between Equity- and Law should be distinctly ascertained. Without this, the parties to a suit could not know by which system of rules they were to be governed, and the Judge,'? of the two courts would often, be at a loss what judgment to pronounce. If this did not impair the rights of the citizens, it would at least render the remedies for them uncertain, which 1 would be productive of much trouble and expense. But there is no ground for apprehending this mischief in the present instance. It ap-¡ *79 pears to all the Judges that the complainants h?.d not .a plain and adequate remedy at law, and that the case came fully within the established jurisdiction of the court. It .came within the principle recognised as a settled one in Weymouth vs. Boyer, 1 Ves. 424, “ that if the remedy at law was difficult in a case, the court would not pronounce against the jurisdictionfor it is obvious, from the circumstances stated in the decree, that without the interference of this court, the complainants would be exposed to all the litigation there adverted to. In the case also of Bond vs. Hopkins, 1 Sch. and Laf. 429, it was said by Lord Ecdesdule, “ nothing is better established in Courts of Equity, than that where a title exists at law and in conscience, and the effectual assertion of it at law is obstructed, relief should be given in Equity.”
But there is another and plainer ground of jurisdiction in this case. The complainants had a right under the special circumstances of their case, to bring their bill, for an account of the mesne profits. The act of 1791, provides indeed a very convenient legal remedy, by empowering a jury to award damages for mesne profits in the same verdict by which the land is recovered. But the act does not say that this shall be the exclusive remedy ; it only declares that in future one legal remedy shall serve both for the title and the mesne profits ; it therefore only alters the common law, which required that there should *80 be first an ejectment to establish the title, and afterward;,* an action of trespass to recover the mesne profits. Eat the jurisdiction over the subject, which before belonged to the Court of Equity, still remained, and it will appear from a number of authorities, that it was properly exercis - ed in this case.
In Dormer vs. Fotescue, 3d Atk. 129, the chief object of the bill was to have an account of the mesne. profits, and it was asked by the opposite counsel, “ what hinder? the plaintiff from bringing an action of trespass for the mesne profits, which may be done with as much ease and less expense than an. account taken before a master?” Lord Hardtoicke said, “I am of opinion under the circumstances of the case, that the plaintiff has a right to come into this court for that purpose. ” And he adds, “there are several cases where this court has decreed such an account. As in the case of a bill' -brought hy an infant to have possession of an estate, and an account of rents and profits, the court will decree an account from the liine the infant’s title accrued ; for every person who enter? upon the estate of an infant enters as a guardian or baliif for the infant.” And so says Ly Melon. Lord Hardtvicke further states, that there are instances where, upon amere legal title, the court have decreed an account of rents and profits ; and he refers to the case of the infant as one instance ; also to the Duke of Bolton vs. Dean, Prec. in Cha. 516, where the title was at law, and yet the court decreed an account. He cites also Bennett vs. Whitehead, 2 P. W. 644, a still stronger case, in which he says, “I was counsel in it myself, and it was a mere legal title, and the deeds were in the custody of the plaintiffhimself.’5' An exception is made, conformable to the civil law, of one who is bona fide possessor, who shall not account. But this means, says Lord H. “ where the person possessing is ignorant of all the facts and circumstances relating to his adversary’s title.” Against such a one, it is admit-t-ted, the remedy must be at law. So, where the- claim is not that of an infant, where no title deeds are sought for, *81 so difficulty in the legal remedy, no trust, a bill will not be entered for mesne profits. But in the present case, the complainants are minors, they seek for the title deeds, their rights have been already established in this court, their legal remedy is a complicated one, and the possession of the defendant was obtained with a full knowledge of her claim. On all these grounds,, then the complainants had a right to come into .a Court of Equity for the mesne profits.
3d. The third objection is, “ that the Circuit Court assumed a jurisdiction not warranted by the previous usage of the same in trying the validity of a title to a freehold between adverse claimants-.”
The discussion of this subject might be avoided, by insisting, that the fact on which it is founded, did not occur in the case. The validity - of the title was not tried by the court. This, as has Wen before stated, was considered as conclusively settled by tW Court of Appeal». ■
But this objection is also unfounded, on principle. If it should prevail to the extent contended for, it would deprive the Court of Equity, of a large portion .of it’s jurisdiction ; for the title of lands depending on the construction of wills, is a direct and frequent subject of its cognizance. As a general rule it will not be denied, that a title to land must be tried at law ; but in certain cases a Court of Equity may also take cognizance of it. This fully appéars from the eases already cited, but the following are more explicit on the point. In Tanner vs. Wise, 3 P. W. 296, it was expressly held, that “ where a title to lands depends on the words of a will only, it was as properly determinable in equity as at law.” And the court there decided on the title, although the bill only prayed for the delivery of the title deeds. In Dupont vs. Scott, heard before me in Charleston, 1818, and afterwards before the Court of Appeals, the jurisdiction of the court was carried still further. The complainants claimed a tract of land from the defendants, on the ground that it was held as a trust, and I had no doubt that the original possession *82 óught to he regarded in that light; but as the defendants insisted on a title by adverse possession, and there was evidence of acts done by them which might amount to a. legal disseisin, I thought it most proper to direct an issue to try that title at law, as had been before done in the. case of Ramsay vs. Deas, 2 Equ. R. 289. But on the-appeal this court took entire cognizance of the question, declared the whole possession a trust, and decreed that the-defendants should deliver up the land to the complainants. The same course appeal's to have been taken in the case of Bond vs. Hopkins, 1 Scho, and Lef. 422.
On a bill for the recovery of lands which were there alleged to be fraudulently held, the defendant set up an adverse title by possession.
The master of the Rolls decreed, that the plaintiff should have leave to bring his ejectment, but that the statute of limitations and other legal impediments should be no bar to his suit.
The Lord Chancellor afterwards, on an appeal examined, himself, the adverse title, enlarged the decree, and ordered the defendants to deliver up the lands. It is evident from these cases, that the cognizance which a Court of Equity takes of the' title to land is perfectly consistent with the general jurisdiction of the Court of Law. It determines on a title depending on the construction of a will,because this is a subject only of interpretation ; and it relieves against an adverse possession on the ground of fraud, or of a constructive trust. But in all cases of a bona fide adverse possession, or any other common title to land depending on evidence miosis, the jurisdiction is acknowledged to- belong exclusively to a- Court of Law.
Here we might conclude the discussion of this case. The views which have been taken of the competency of the ordinary jurisdiction of the court, on all the points objected to, render it necessary to’ resort to the extraordinary ground oh which the Circuit Court partly rested its decree. And we are glad to be relieved from the duty of maintaining a ground which Would involve this court in a *83 •conflict of jurisdiction with the Court of Law. Such a conflict ought, if possible, to be avoided, for the obvious tendency of.it must be to lessen the'publie confidence in one of the courts, and perhaps of both ; the evil effects of which would be felt by the whole community.
But we cannot affect to be ignorant that the construction given by this court to the will of William Wilson in the case of Grant and al. vs. Thompson and al. has been -Since judicially impugned, and has also excited much professional interest. It is therefore, thought necessary to give to that case a more full consideration than it before received ; and it is believed that the result of this will shew that the former opinion of this court is supported by the soundest principles both of law and equity.
The words of the will of William Wilson which are material to be considered are the following — “ The rest .arid residue of my estate, both real and personal, to be equally divided between my two grandsons Wilson and •Thomas, and delivered to them at the age of 21 years, but •should they die'leaving no lawful issue, in that case I give and bequeath the whole of my estate, both real and personal, to Richard, Thomas and Mary Godfrey, Rebecca Potts and Thomas Balloiv, to be equally divided between them.”
■ The testator’s grandson Wilson died under age, and without leaving issue. By this event his moiety Accrued to the surviving grandson Thomas and his issue, as'a cross remainder by implication.
The words “ should they die leaving no lawful issue,” me sufficient, to raise this implication. It has been expressly so ruled in the following cases, Holmes vs. Meynell, T. Raym. 453. Wright vs. Holford, Cowp. 31. Phipard vs. Mansfield, Id. 800. Mackell vs. Winter, 3 Ves. 541. And Green vs. Stephens, 17 Ves. 74.
The testator has also said that his tvhole estate, and not a part, shall go over to the ulterior remainder-men ; this is saying in other words that the lin>itation shall not have effect until a failure of isstre of bjhh his grandsons, wdiielj *84 necessarily implies that they were to take cross remainders.
We-must consider then the devise as confined to the grandson Thomas Wilson, and the only question to be examined, will be, what estate did he take under the will ? This coux-t has decided, that he took by'necessary implication an estate for .life, and that his children became entitled, at his death, to the remainder. It has, however, been strenuously insisted that the words of the will gave an absolute estate to Thomas Wilson, and no distinct interest to his children. And in order to shew this, it has been very elaborately argued, that a devise of “ all a man’s estate” passes a fee ; also, that a legacy, <£ payable at a future day,”, vests an absolute interest; from -which, it is concluded, that the devise of William Wilson of “ the rest and residue of his estate to be delivered to his grandsons at the age of twenty-one yeai-s,” gave them a fee simple. Both of these general positions are such plain legal truths, that no Judge-would hesitate in assenting to them ; and if the question now under considei-ation depended on those positions only, the conclusion drawn from them would admit of no controversy ; but the question rests on other grounds. The testator uses other words, which shew a different intention ; and we are óf opinion, that these will control the legal effect of the preceding words.
In evexy question arising out of a will, the first inquiry should always be, what did the testator intend? If his intention is plain, it 'will control the technical sense of words ; if it is obscure, the technical sense must prevail. Every Judge professes to follow this rule, but in the application of it to particular cases, it is. often difficult to determine whether the popular or the technical sense shall predominate, and the cases, therefore, abound with contradictory interpretations of both. This ought greatly to diminish the authority of precedents in every question of this kind. If it depends on intention only, precedents are of no authority ; for as the plain intention of every will *85 must go vern it, so the intention of every testator can only make the law for his own will. Nothing, indeed, can be more unjust and absurd, than to insist that the intention, of a testator, who died one hundred years ago, should explain the meaning of every other testator who has used similar words since, and should make the law for every other will in which they have been used. ' All that can justly b,e required is, that where technical words alone are used, unexplained and uncontroled by any others, their technical sense shall be taken as the testator’s meaning ; and that precedents shall determine that sense.
As the construction of the will before us must rest chiefJy on intention, it is of importance before going into the consideration of it, to shew from the opinions of some of the most enlightened Judges, its over-ruling and almost unlimited control over technical construction.
“ If the words of a will (says Lord C. Macclesfield) can bear two senses, one whereof is more common and. natural than the other, it is hard to say a court. should take th,e vvill in the most uncommon meaning ; to do what ? to destroy the will. A testator who is inops' consilii, will,-under such circumstances, be supposéd to speak in the common and natural,' not in tide legal sense.” — • [Forth vs. Chapman, 1 P. W. 666.)
Mr. Justice Puller, in speaking of the rule of intention, says, “ This is the first and great rule in the exposition of all wills, and it is “a rule to which all others must bend.”
And after stating its subjection to the great principle of .national policy alone, which forbids any perpetuity, or any tendency to it, he adds, “ I know of no case, which says, that a technical sense of “ any words whatever, shall prevail against it.” (Hodgson vs. Ambrose, Doug. 327.)
Lord Thurloio too, in referring to Mr. F'earne’s discussion of the doctrine of Contingent Remainders, adopts this as his conclusion, “ that the Court of Chancery will go any length possible to carry the intention of the testator into execution, for the benefit of those to • whom the *86 testator designed a benefit.” (Knight vs. Ellis, 2 Bro. 66, 557.)
Lord Jllvanly too, (while master of the rolls) thus expresses himself — “ I know only one general rule of construction, equally, for Courts of Equity and Courts, of Law.j applicable to all wills. The intention is to be collected from the whole will taken together. Every word is id have its effect. Every word is to be taken according to -the natural and common import,” , (Thelusson vs. Woodfard, 4 Ves. 329.)
But, however full these authorities may he to establish the general rule of intention, it must he admitted that they do not carry it to the extent which the will under consideration requires. The construction which this court has given to the controverted words, rests on an implied intention, and it is therefore further necessary to shew that such an intention comes within the general rule. I refer then, in the first place, to the great modern commentator on the law, Mr. Justice Blackstone, who thus lays down the rule. “ By will also, an estate may pass by mere implication, without any express words; and in general where any implications are allowed, they must be such as are necessary, or at least highly probable. And herein, ihere is no distinction between the rules of law and equity. The will is construed in each with equal favor and benignity, and expounded rather on its oion particular circumstances, than by any general rules of positive law.” (2 Blacksione’s Com. 381.)
Mr. Fonblanque, a profound commentator on the law of Equity, comes to the following conclusion, after a full examination of all the cases on the subject. “ In the construction of a will," an estate may “ arise, be enlarged, controled, and even destroyed by implication.” — (2 Eonb. 56.)
Lord Kaims, also, in his “ Principles of Equity,” (2 vol. 239, J has a distinct chapter on implied will, and thus defines it: “ Implied will, where made clear from circumstances, ought to have the same authority with- ex *87 pressed will. The only use of words is to signify will or intention, and from the very nature of the thing, will or intention cannot have greater authority when expressed in words, than when ascertained with equal clearness by any other signs or means.”
In Oates vs. Cooke, (3 Burr. 1686,) Mr. Justice Wilmot said, “ If it he necessary to imply intention, it is the same thing as if it was particularly expressed.”
• And in Robinson vs. Robinson, (1 Burr. 51,) the Judges certified unanimously their opinions, a that an estate tail must .be raised by necessary implication, to effectuate the manifest general intend of the testator, notwithstanding an express estate for life and no longer.” — • This opinion was affirmed by the House of Lords. And it is worthy of remarle, that this case was sent out of Chancery, where Lord Hardwiche had previously declared an opinion, that as the devise' was expressly for life, and no longer, it could not, by any necessary implication whatsoever, be construed to be an estate tail, (3 Atk. 786.) It appears then that the rule was carried to its greatest extent by a Court of Law. \\
I will conclude this preliminary view of the subject, With the opinions of several eminent Judges on the true meaning of what is called necessary implication. In considering an analogous subject, Lord Eldon observes, <e That since it has been laid down that express words are not necessary, there must be in the will, that which is sometimes denominated evident demonstration, sometimes plain intention, or sometimes necessary^ implication. Thus much can be collected from the cases ; but when you proceed further and inquire what it is that constitutes this evident demonstration, plain intention, or necessary implication, it appears to' me that Lord Mvanly is right when he says, “ you are not to rest on conjecture ; but the mind of the Judge must be convinced that he is deciding according to what the testator intended,” Lord Mvanly also adds, in the case here referred to, “ It must be such an inference as leaves no doubt on the mind *88 of the person who is to decide upon it; but it need not he such that no man can doubt upon it.” (Brummel vs. Prothero, 3 Ves. 113.)
Lord Eldon goes on to observe, “ that the same circumstances have, in the minds of different Judges, led so often to differeUt conclusions, that Lord Thurloiv, in a similar case, expressed his opinion, “ that the notion of deciding by precedent, in questions of this nature must be abandoned; and that the court must, in every such case, abide by the clear intention; which indeed all judges affect to go upon, but seldom agree upon the principles to be applied in collecting it,” (Bootle vs. Blundell, 1 Meriv. 219.)
These opinions are of high authority in two respects.— They not only define the meaning of implied intention, but they support the position before taken, that ¡precedents are of little weight in all questions of mere intention.
I come now to the consideration of the particular words in controversy.
The testator devises “ the regt and residue of his estate-to be divided between his grandsons at the age of 21 years,” add adds, “ should they die leaving no lawful issue,” then the whole to go over to the Godfreys and others.— This courthas determined in the case of Grant v. Thompson, that these words, “ leaving no lawful issue” manifest 2plain intention in the testator to provide distinctly for the issue of his grandsons, if they should leave any.
And if the common sense of the community could be consulted on it, there would not probably be found one mind which would hesitate in deciding that this must have been the intention of the testator. It is very clear that the persons to whom the estate was limited over, could take nothing if the grandsons left issue.
The testator must therefore have intended that the issue should take something. And what could this be but the intermediate estate ? It has been said that the issue were only named to describe the contingency on which the *89 éstate was to go over ; and the case of Barnfield vs. Wetton, (2 Bos. and Pul. 338,) has-been cited, in which lord Eldon, the C. J. of the Com. Pleas, pat this construction on similar words.
As that case has been greátly relied on, it will be necessary to give it a particular examination. The devise was of certain lands “ to S. S. her heirs and assigns for ever, but if she should die. leaving no lawftd issue at the time of her death,” then a devise over, Slc. S. S. died with-4 out leaving issue, but had before suffered a recovery of the premises to the uses of her will; and the sole question was whether the limitation over was a contingent remainder on an executory devise. The' court determined that it must be construed an .executory devise, because there was an express estate in fee giyen to S. S. and a contingent remainder could not be raised on such an estate. As the testator, however, must have named the issue for some beneficial end, and every word of a will must have'its effect, the subsequent words “ if sKe should die leaving no lawful issue” could not be overlooked ; and Lord Eldon got rid of the difficulty which they interposed, by supposing that they were merely intended as a description of the contingency on which the limitation over was to rest; and that the power which S. S. would have of providing for the issue, by taking an estate in fee, would satisfy the intention of the testator with respect to them. Such a construction, however objectionable it may be, Will not be disputed, because it appears to be founded on what the court supposed to be the intention of the testator in the case. But if this was the foundation of that decision, we' may also be allowed to decide thé present case on the same independent ground. The words here are different, and it is the intention of a different testator which is under consideration. We are not bound, therefore, - to come to the same conclusion with Lord Eldon, in his construction of similar words in another, will; and for this we have not only the authority of Lord Thurlow, as before stated, but even the authority of Lord Eldon himself, who in de *90 eiding on a question of intention on another occasion has-said, “ I do not mean it should be inferred that other Judges might not come to a conclusion respecting this will the reverse of that which I have come to ; on the contrary, I hold that a difference of opinion will always beunavoidable in cases of this nature.” (Bootle vs. Blundell, 1 Meriv. 239.)
This case then of Barnfield vs. Welton, is no.authority on the question of intention. But it would be a fatal authority for the claims derived from sales by Thomas Wilson, if the legal ground assumed in it was applicable to the case before us. It was cited for the purpose of shewing that the will of W. Wilson gave a fee simple to the grandsons, and if they left no issue, an executory devise to the Godfreys and others.
But the advocates for this construction do not seem to be aware that the legal effect of it would deprive the grandsons of the power of alienating any part of the estate during their lives, and thus afford as effectual security to the issue for their interests as the construction for which we contend.
In this same case of Barnfield vs. Wetton Lord Eldon expressly says, “ If this be a good executory devise, a recovery will not bar it; and it is equally true, that the courts always endeavor to construe a limitation, a contingent remainder, rather than an executory devise. The policy of the latter rule is founded on the very circumstance that an executory devise cannot be barred.” The recovery therefore which had been suffered by the tenant in fee, was set aside.
So in Porter vs. Bradley, (3 D. and E. 145, ) where, the first estate was held to be a fee, and the limitation over an executory devise, the tenant in fee, believing that he took an estate tail, suffered a recovery and sold the land. But the court set aside the sale, because the limitation over was a good executory devise. 'The same rule will be found laid down in a number of other cases. — (Pells vs. Brown, Cro. Jac. 590 Heath vs. Heath, 1 Bro. *91 C. C. 148,) &c. And Mi'. Fearne, in treating of the difference between a contingent remainder and an executory devise, states it to consist in this; “ that the first may be barred by several different means ; whereas it is a rule, that an executory devise, cannot be prevented or destroysd, by any alteration whatever in the estate, out of which, or after which it is limited.” (Fearne, 306.) It may be said that an alienation may be good against the issue, although not against the executory devises. But the cases make no such distinction, and Fearne in another place says, “ every executory devise, as far as it goes, creates a perpetuity ; that is, an estate unalienable until the contingency be determined one, way or another.” (Ibid. 315.) But such a contingency cannot be determined till the death of the tenant in fee ; for although he may have issue during his life, yet he may not leave any at his death, and therefore during his lifi the estate must be unalienable.
But it is not intended to insist on this ground, however strong it may be. The object of the present argument is to prevail by the strength of its own construction of the case, and not by the weakness of the opposite argument. I recur again then, to the construction, that the words, “ should they (the grandsons) die, leaving no lawful issue,” were intended to give the issue the intermediate estate. It is important here to remark, that even the general, expressions “ should they die without issue,” which are understood to mean issue indefinitely, have been construed in most of the cases in which they have occurred to intend a distinct benefit for the issue, although there was no direct gift to them. As they could not, however, take as purchasers for want of a definite description, the court has implied, in those cases, an intention, “ that the first taker should so take, that the property might be transmissible through him to his issue, and he was therefore, considered as taking an estate tail,- which would descend on his issue.” This is the language of Lord Thurlow in Knight vs. Ellis, (2 Bro. C. C. 578. ) And the same principle is adopted in other cases. (Cro. Ja. 448. *92 P. WV 25. 2 Vern. 766. 1 Eq. Ab. 179. 3 Ridge, P. C. 365.)
. But in the case before us, the words are definite with respect to the issue, and amount to a, direct gift to them; as will be shown hereafter from the authorities which will be adduced. And yet it is denied in the opposite argu-, ment, that the testator intended for them any distinct be-, peñl.' They are supposed, (adopting the notion of Lord Eldon,) sufficiently provided for by his giving to their father an estate in fee, and to have been named by him for no other purpose than to raise a benefit to his distant relations. Can it be seriously believed that this was all that the testator had in view? Would he be so provident in preserving his “ wdiole estate” for his distant relations on the failure of the issue, and yet leave the issue dependant on, their father, who from caprice or partiality might give the whole to a wife or a favorite child, or who from misfortune or waste, might have nothing left to give ?
‘ But it has been insisted that the testator intended an absolute estate for his grandsons,' because “ he would be more solicitous to provide for such of his posterity as he, knew, than for those who might never come into .existence.” This might be correct as a general presumption, •but is certainly not so, where future objects are expressly had in view. For how often do we see testators giving to their children only a life estate in their property, and reserving the full enjoyment of it to the next descendants ? We see indeed, in one extraordinary instanoe, (case of Tkelusson, 4 Ves. 227,) a testator withdrawing the em tire enjoyment of a vast estate from three generations of his family, in favor of remote objects, whom it may finally be difficult to ascertain. This solicitude to continue property in their families, is manifested by men of every condition in society ; and if it is not carried further than the law allows, the indulgence of it to that extent, is per-, fectly consistent with the soundest policy. Property would lose a great part of its value in the eyes of most men, if it ■ could npt be thus disposed o.f. The pleasure *93 Which the accumulation of it affords to many, seems to consist less in the enjoyment of it themselves, (for to some it does not bring a single comfort) than in the anticipation of the future ease and importance which they expect to confer by its means on their children and grand-children. This disposing power is obviously then an incitement to the industry of the country, and ought on that account to be favored to the extent of its legal boundary ; and in all doubtful questions, therefore, the courts should presume the legal exercise of it, instead of opposing to it artificial constructions, which almost always defeat the reasonable intention of the testator, and arbitrarily make for him a new will.
This view of the subject, if correct, must overturn the presumption that the testator, in the ease before us, would only be solicitous to provide for his grandsons ; and it greatly strengthens the presumption that their issue were distinctly in his contemplation. It is manifest that he was one of those who wished to keep his estate in his family as long as he could, for he expressly provides that “ the whole shall be preserved for his distant relations, if there should be no issue. Must he not then have intended that the whole should be preserved for the issue, if there were any, who would be his own descendants ? Both nature and reason call for this presumption, and in order to carry it into effect, we must construe the will to give an estate by necessary implication to the grandsons for life only, and the remainder to the issue as 'purchasers.
Here we have to encounter an objection, which seems to be considered as insuperable on the opposite side. It is insisted that “ an estate can never be implied to issue as purchasers /’ and the rule is so laid down by Mr. Fonblanque, (2 vol. 63,) who rests it chiefly on the authority of Lanesborough v. Fox, (Ca. tem. Talb. 262,) and Bodens vs. Watson, (Amb. 478.) When these cases, however, are. fully examined, it will be found that they do not authorize the rule to the unqualified extent in which Fonblanque had laid it down ; and it is clearly *94 not authorized by the original decisions on the subject. — * It will be shown also that the rule could notapply to a case like this, even in the English Courts ; and that it never can apply in its feudal sense, (which is the one here insisted on) to any case arising in this court.
The case of Lanesborough vs. Fox, was briefly this. — ■ A. devised his right of reversion in certain lands contained in a settlement, “ on failure of issue of the body of his son B.” to his daughter F. and the heirs of her body. It was adjudged in the House of Lords that these words did not give an estate tail by implication to B. and the devise to F. was void, as being on too remote a contingency, ( Ca. tem. Talb. 262.) Mr. Fearne, in commenting on this case, assigns as the reason for the decision, that there was Bo subsisting estate in A. extending to the issue of B. and therefore the estate devised by A. could not be considered as the devise of a reversion depending on such preceding estate, (Fearne, 226.) It appears from this that the intention could not have effect, because there was nothing on which it could operate, and not because it contravened the rule now insisted on. How then does this case support the rule, or how does it control the general rule of intention ?
So in the case of Bodens vs. Watson, the testatrix directed her estate to be sold and laid out in the funds for the plaintiff during his life, and “ if he had no heirs” to the defendant. The question was whether the devise over was too remote, being after a dying without heirs generally ? This was clearly a question of technical construction, and Lord Nórthington so considered it. u I cannot” says he, “ imply a gift to the issue as purchasers, for such an implication must be necessary, which is not the case here.”
And again, “ the failure of heirs is not confined to á particular time, but is general.” This is saying expressly that a necessary implication would be sufficient to raise a gift to the issue as purchasers ; and Lord Hardwicke had before determined, in the case of Read vs. Snell, (2 Atk. *95 646,) (which will be more fully noticed hereafter,) that ■the word leaving as applied to issue, was a word oí purchase, and would raise an estate in remainder by necessary implication. What then becomes of the supposed inflexible rule to the contrary ?
But I proceed to show that it is not authorized by the original decisions on the subject.
The earliest case referred to is in the yearbook of 13 If. 7, which is thus stated by Plowden : — “ If a man devises land to one, habendum to him and to his heirs, after the death of the wife of the devisor, then although the wife is not named, yet she shall take an estate for life thereby,’-'’ (Plowd. Com. 158.) The editor of Plowden undertakes to correct this statement, and insists that the case in 13 II. 7, was not a devise to a stranger, but to the heir at l&w, after the death of the wife, which he agrees carries an estate for .life to the wife by necessa;y implication, because the heir is expressly excluded from taking it until after her death. But the same rule is again recognized by Plowden, in a subsequent part of his Commentaries. — “ If says he, one devises land to a man after the death of his Wife, the wife shall have an estate for life, although it be not given to her, and this is by reason- of the intent, (Plow. Com. 414.) Now, although the case in' 13 H. 7, may have been a devise to the heir, yet it does not follow that the rule was not applicable to a stranger also ; and surely Plowden, who ranked with Littleton and Coke as an oracle of ancient law, ought to know better what that law was than any modern lawyer.*
I think it must appear from this examination that the Ale which has been so strongly relied on, is as much undérlthe control of intention as any other rule, and is made to yield even in the English Courts to words of necessary *96 implication. But the operation of it in our courts musf> be still more limited for another reason. Its chief object is avowedly to protect the interest of the heir at law, who has always been so great a favorite with the law of England, that almost all the technical obstacles opposed to intention, seem to have been created for his benefit.-1— He is there the representative of family pride, and the depositary of a name and estate which it is the policy of an aristocratic government to preserve in perpetual existence; and therefore every presumption is made ift his favoiv But here we have no heir at law. A more just policy, and one more suited to our republican institutions, has long ago abolished the un-natural claims of primogeniture. Real estate is here no longer transmissible by descent ; the act declares that there shall be an equitable distribution of it, and itris placed on the same footing as ¡personal estate. Every rule, therefore, incident to the right of primogeniture, must, as far as it relates to that right, be necessarily modified ; and the rule under consideration can only be recognized in our courts, after being divested of this feudal principle. It must then sink into the rule which has been applied to devises where the interest of the heir was not concerned; as where the devise has been of a term, or any other personal estate. It must be obvious for the same reason that the distinction which prevails - in the English cases, in the construction of the words “leaving no issue,” with a reference to real or' personal estate, cannot exist here. Lord Kenyon has denied the existence of it even in England. “ It would be very strange,” says he, “ if these words had a different meaning when applied to real and personal property. If such a distinction existed in the law, it certainly would not agree with the rule lex plus laudatur, quando rations probatur; but it is not founded in law.” (3 D. fy E. 146.) Lord Eldon has indeed expressed great alarm at this opinion, and considers it an outrage on a settled rule. ( Crooke vs. De Vandes, 9 Ves. 203. ) But it is unimportant to' us what the rule may be in England ; it is sufficient for' *97 dur purpose that, this distinction is untenable in our courts, and it maybe left to the English Judges to settle the question in their own way.
There remains one more objection to be considered.— Great stress has been laid on the devise to the grandsons being an estate in fee, which is supposed to preclude any implication to the contrary. This objection has been partly answered by the cases already cited, and particularly by that of Robinson vs. Robinson, in which all the Judges of the King’s Bench concurred in construing an express estate for life, to be an estate tail, in order to effectuate the intention.
The case of Porter vs. Bradley, (3 D. & E. 145,) is another strong casé, ifi which Lord Kenyon thus lays down the law — “ the first part ofthe devise carries a fee, for it is to him, his heirs and assigns for ever ; but it is clear that those words may be restrained by subsequent i.ones, so as to carry only an estate tail.”
In Bean vs. Halley, (8 T. Rep. 8,) Lord Kenyon is still more full on thé point. “ I will not (says he) go through all the cases on this head, because they were examined most minutely in that, of Robinson vs. Robinson, which was sifted and considered more than any preceding case.
That case was agitated for nearly half a century. It first came on in Sir J. Jekyll’s time, and was not decided until after Lord Hardwicke had left the profession ; and though the latter entertained some doubts during its discussion in the House of Lords, (he had, it appears, given a contrary opinion in the Court of Chancery,) he concurred in the unanimous opinion of the Judges, delivered by C. Baron Parker. By that case, this position is clearly established, that in the construction of a will, we must first look to the general intent of the devisor, and give effect to that; and if there be a secondary intent which interferes with it, we are to. reconcile the whole as far as we cán, but at all events, to give effect to the general intent tion.
*98 In that case the special intent was defeated; the first limitation was to L. H. for life and no longer ; nothing therefore could be more clear than that the devisor only intended to give him an estate for life ; yet seeing that that particular intent was inconsistent with the devisor’s general intent, which was that the whole line ofmale heirs of L. H. should lake, the court thought that they ought, in convenience and in law, to effectuate that general intent.” So-in the case before us, it may be admitted that W. Wilson intended to give an estate in fee to his grandsons ; hut he-intended also that his estate should go afterwards to their issue, and' if not, to collateral relations. As an absolute-estate'to the grandsons would be inconsistent with this-general intent, we are bound to construe the- devise to them an estate for life only, in order to carry into effect such general intent. Mr. Just. Jishhurst in concurring pvith Lord K. in the above case, observed “ that the cases-of Robinson vs. Robinson, and Bamfield vs. Popham, had brought back the rule of law to its natural channel, namely, the general intention of the testator, and freed it from the fetters of technical rules.”
I have so far considered the will under examination on-its own independent ground of intention, which, according to the principles- before laid down, is the true ground on which it ought to be determined ; but as the construction we contend for is ;also fully supported by precedents, and it may be a further satisfaction to shew this, I will refer to some of those which most directly, apply to it. In Forth vs. Chapman, (1 P. Wms. 667,) the words were (after -giving the estate to the first taker without the words for life)' “and if my said nephew shall depart this life, and leave no issue of his body,” then a devise over. — ■ Lord Macclesfield was of opinion that the words were descriptive of issue at the time of the death of the nephew, and the'devise over was good. This was saying, in other words, that the issue, if any, would have taken as purchasers. I: quote, this case from 2 ,/ll.Ic. 647, as it is there *99 stated by Lord.Hardwicke, who says he took it from his own note of the case, having been counsel in it.
Again, in Read vs. Snell, (2 Atk. 642,) the testatrix left her whole estate to be settled on her daughter and the heirs of her body, and adds, “but in case my said daughter should die, leaving no heirs of her body, then I bequeath over, &c. Lord Hardwicke said, “ I am of opinion that this is a gift to the daughter for life, with a contingent remainder to such heir of her body .as shall be living at the time of her death. There have been many cases where heirs of the body have been construed words of purchase.” “ It has been objected, that the words for life are not in this will. But I do not know that any weight has been ’laid on the want of those words when the intention of the testator has otherwise appeared.” — (Ibid, 643.)
So in Lamply vs. Blower, (3 Atk. 397,) the testatrix gave by her will to her two- nieces, “ each one half of the produce of bank stock, and to their issue, and if either of them should happen to die before the legacy became due, and leave no issue, the share of -her, so dying, should go to the survivor.” One of the nieces died, leaving a son, who brought his bill for the moiety of the Bank Stock.— It was objected on the other side, that there was no bequest to the ancestor for life, and therefore the issue could not take by way of remainder. But Lord Hardiuickz again recognized the settled rule, that the words “leave :no issue” were relative to any child which the - legatee might have at the time of her death; and ¿lthough the preceding gift was to the mother and her issue indefinitely, which would vest the whole interest in the mother, yet it was said the subsequent words showed that the issue were to take after the mother, and the court decreed for the •plaintiff accordingly.
These cases confirm, most explicitly, every -ground ■which has been contended for. They recognize the rule of intention as the paramount rule. They concur in construing the words “ leaving. no issue,” as words of *100 purchase. They declare that these words are such a personal designation of the issue as to amount to a direct gift to them. And lastly, although there may be no preceding estate for life, or although there may be an express estate in fee, or in tail, to the first taker; yet, in order to effectuate the intention, these words will raise, by necessary implication, an estate for life to their first taker, and a contingent remainder to the issue.
I here close the argument. This united authority of precedents and principles,'in support of the construction given by this court to the will of TV. Wilson, ought I think to be . conclusive. It would, however, be presuming too much to expect that it will satisfy every judgment. The bias produced even in liberal minds, by opinT ions previously formed or professionally adopted, forbids such an expectation. But it is believed that it will satisfy fhe candid and enlightened judgments of those who have no such prepossessions; and it is confidently hoped that it will afford a sufficient refutation of the charge contained in one of the grounds of appeal, “ that the jurisdiction which has been exercised by the court is an unwarranted assumption of power.” It is the license of the bar, and perhaps it is their privilege, if exercised with decorum, to, arraign such decisions of the bench as appear to depart from any fundamental principle. But an apparent departure may, when more fully examined, prove to be an authorized act; and especially where the question relates to the application, as in the present case of the ancient law of England to the tenures of this country. Our ancestors in adopting the common law, expressly excepted such parts of it as were inconsistent with our peculiar institutions ; and as such a discrimination was not easily susceptible of Legislative regulation, they must have intended that this should be left to the sound discretion of the courts. In England, the modifications, which the ancient law has been continually undergoing by judicial decisions, have, in tiie lapse of time, so changed the original system, that *101 (¡the sages of two centuries ago would not, if now alive, recognize it as the same.
Such modifications are rendered necessary by the progressive changes in the moral and political state of society ; and if they are so gradual as to give no alarm to the jealousy of the profession, by rendering legal advice uncertain, they must be justly'considered as safe and necessary improvements in jurisprudence. But there cannot be a greater public mischief, and one more to be deprecated than an abrupt judicial change in a settled rule of law 3 for this must subvert existing rights, and would be legislation in its worst form. So any unwarranted interference with the jurisdiction of another court, by assuming its powers, or opposing its authority, must also have the most mischievous tendency. It is not believed, however, that it is seriously intended to impute either of these acts to this court. The animadversions of the bar, on particular decisions, will often be indulged to great extent, both in argument and in conversation; but a cooler exercise of judgment, and a more perfect examination, would not, I gm persuaded, permit any^member-of it, who possessed á full knowledge of the legitimate powers of this court, to make a deliberate charge of this nature.

 KOTE BY MU. KXSYÍ OP CIIAULESTOST.
* The case of Starke vs. Woodward, referred to by the Chancellor in ilis decree, was tiled before Judge JVott, “and the only question made, was whether the decree of the Court of Equity was final and conclusive as to the right of property. The presiding Judge held that it was so, and refused to let the defendant introduce any testimony to controvert it.” In delivering the opinion of the Constitutional Court, the same learned Judge cites, and no doubt sanctions by his citation from Oahan & Main-gay’s Irish Term Reports, p. 40, the observation of Chief Justice Lee, “ that Courts of Law pay such deference to the judgments of each other, in matters within their jurisdiction, that the first determination by a. proper authority ought to prevail.” And in the case of Scott vs. Cohen, Jmdg'e Bay in delivering the unanimous opinion of the Constitutional Court on the point there determined, seems to concede a superiority to the Court of Equity, which very certainly has never been claimed by the Judges of that Court. His Honor says, “But if any doubt *79 could arise upon the construction of the common law, surely none can. remain now after the Becrce of the Court of Equity. This is certainly the highest Court of Judicature in Carolina, inasmuch as it, in many cases, controls the courts of common law ; all the parties were before that court, and their claims and pretensions to this very land in dispute, among others, were before it and fully investigated, and after mature deliberation, they decreed the lands of old IVilliam Scott, the uncle, to have become vested in William Scott, his nephew. This court is bound by that Decree, we cannot unravel it, or say it was not founded in law and justice. On the contrary, the respect due to so high and solemn a tribunal, compels us to submit to its decrees; and in the case of Starke v. Woodward, 1 Nott & McCord, 259, 329, lately determined at Columbia, the same doctrine was laid down, and determined- by the unanimous assent of all the Judges.”

NOTE BY ME. KING.
* Professor Christian, in his notes on 2 Black. Com. 381, says — “It has been thought that if it is given to a stranger, &c. &c.” This shows the inclination of his own opinion to be in favor of the above construction of Plo-ioden.